Richard BICHLER, Plaintiff-Appellant,

v.

UNION BANK AND TRUST COMPANY
OF GRAND RAPIDS, et al.,
Defendants-Appellees.

No. 82–1103.

United States Court of Appeals,
Sixth Circuit.

Argued Jan. 16, 1984.

Decided Sept. 17, 1984.

As Amended Oct. 30, 1984.

Wilson M. Jackson, Jackson & Laska, Dorsi Bosca (argued), Warren, Mich., for plaintiff-appellant.

J.A. Cragwall, Jr. (argued), Warner, Norcross & Judd, Richard Bandstra, Grand Rapids, Mich., for defendants-appellees.

Before LIVELY, Chief Judge; EDWARDS, ENGEL, KEITH, MERRITT, MARTIN, JONES, CONTIE, KRUPANSKY and WELLFORD, Circuit Judges;[*] and WEICK, Senior Circuit Judge.

LIVELY, Chief Judge.

This is an appeal by the plaintiff from summary judgment in favor of the defendant WZZM-TV of Grand Rapids, Michigan, in an action claiming that a broadcast by the defendant invaded the plaintiff's right of privacy. Jurisdiction is based on diversity of citizenship, and the substantive law of Michigan controls. This appeal was originally heard by a panel of the court and its opinion, reported at 715 F.2d 1059 (6th Cir. 1983), was vacated and rehearing en banc was granted in an order reported at 718 F.2d 802 (6th Cir.1983).

## I.

The plaintiff Bichler was president and the principal shareholder of Rebel Promotions, Inc., a Michigan corporation which operated the Thunderbird Dinner Theater in Alpine Township, near Grand Rapids, Michigan. As general manager of the theater Bichler booked various productions, which were advertised in the local press. The productions were also reviewed, and news stories were run about the theater in

---

[*] Judge Kennedy did not participate in the en banc hearing or decision.

*The Grand Rapids Press*, the only daily newspaper in the area.

Bichler hired Jerry Moore and his production company to stage several plays at the theater, including "Hair" and "Jesus Christ Superstar." Moore and Bichler had a dispute after which Bichler stopped payment on a $9,000 check to Moore. Moore then stopped work on "Hair" which was in production and called a press conference to announce the cancellation. The press conference was held at a motel where the cast was staying. In the presence of press representatives and with cameras "rolling" Moore announced to a group of cast members that the current production would cease and that the next scheduled one ("Jesus Christ Superstar") would not begin, at least not on schedule.

James Rummel, news anchorman for WZZM-TV, attended the conference. After it was over he interviewed Moore, some cast members and the motel manager. Moore told Rummel that he had not been paid for the current production and that he planned to sue Bichler for breach of contract. Members of the cast confirmed that they had not been paid and that the cancellation of the production created hardships for them. Moore told Rummel that he was only a middleman; that the money came from Bichler and that Bichler was responsible for paying the salaries of the cast. The "innkeeper" told Rummel that payment for the rooms of the cast was in arrears and that this was also Bichler's obligation.

The press conference and interviews took place between 3 and 5 p.m. on January 21, 1976. Rummel immediately attempted to reach Bichler by calling the theater, his home and a listed place of business, all without success. Later in the evening Rummel drove to the theater with a cameraman and found the building dark and locked. Rummel then returned to the WZZM studio and prepared for the 11 p.m. newscast. David Kowalczyk and his attorney arrived at the studio before air time and attempted to dissuade Rummel from using the story about the theater. Kowalc-

zyk described himself as a "silent partner" in the dinner theater. He had advanced money to Bichler and was worried about the effect the story would have on the ability of the theater to continue operations. He had learned from Moore that WZZM planned to include the story in its newscast. Kowalczyk did not tell Rummel that the information from Moore was false. The gist of his and his attorney's representation to Rummel was that the story "could be the straw that broke the camel's back." Kowalczyk wanted the story delayed for a day or two in order to locate Bichler and get his version of the matter. Rummel refused this request, sought as a personal favor, advising Kowalczyk that the story would run.

The story was broadcast as a segment of the 11 o'clock news. The transcript of the broadcast is set forth in its entirety:

"A report on the closing of the Thunderbird Dinner Theater....

And West Michigan's only Dinner Theater locked its doors today .... leaving a production company wondering what to do next....

With no advance warning .... the Thunderbird Dinner Theater locked its doors today .... leaving about 40 members of a New York based production company and advance ticket holders in the lurch. When we got word of the closing we drove out to the Thunderbird located north of Comstock Park on Alpine Avenue. All we found were locked doors and an empty parking lot.

The news of the closing was broken to the members of the current cast of "Hair .... by the show's producer Jerry Moore:

The Thunderbird Theater has been having financial problems in recent weeks as has it's [sic] owner Dick Bichler. Today, it was Bichler who was catching the blame and the wrath of the cast:

The problem now becomes one of what to do for the members of the current production of 'Hair' .... and for the cast of the theater's next scheduled production of 'Jesus Christ Superstar.' Most of

them are without money and without plane tickets home ... all of which Bichler had contracted for.

Bichler was unavailable for comment today....

Producer Moore will file a lawsuit against him tomorrow charging breach of contract....

And there might be a few advance reservation holders who will be wanting their money back.

According to Moore, more than 3000 dollars in advance tickets had been sold to 'Jesus Christ Superstar' ... slated to open January 28th"

Rummel attempted to locate Bichler the following day, again without success. He also checked the public records and found outstanding claims against Bichler and his business enterprises. The story was "repackaged" and broadcast again at 5:30 that evening.

The day following the second broadcast a local bank called its loan with the theater and repossessed personal property covered by security agreements from the theater premises. Other creditors removed equipment which had not been paid for and the building was largely stripped of its contents within a few weeks. The theater never reopened.

## II.

### A.

In his complaint Bichler charged WZZM with defaming him "by defaming the business entity, the Thunderbird Dinner Theater...." The defamation charged in the complaint consisted of opening the program with a reference to "a cooked chicken" (the Thunder Chicken Rock Theater was an adjunct enterprise), relying on information from Jerry Moore without checking out the facts and making the statement that the dinner theater had "in fact terminated its business for good, which statement was absolutely false and fallacious."

An action for libel was barred by limitations and, as developed in affidavits, depositions and other discovery Bichler's claim was for invasion of privacy consisting of broadcasting embarrassing private facts about him and placing him in a false light in the public eye. The district court identified the portions of the broadcasts objected to as follows:

The alleged disclosure of private facts complained of by plaintiff contained in the broadcast consists of the following:
(1) "The Thunder Bird Theater has been having financial problems in recent weeks as has its owner Dick Bichler. Today it was Bichler who was catching the blame and the wrath of the cast."

The following statements are alleged to constitute publicity holding out plaintiff in a false light:
(1) that plaintiff Bichler was having financial difficulties;
(2) that the closing left ... about 40 members of a New York based production company and advance ticket holders in the lurch.
(3) ... Most of them are without money and without plane tickets home ... all of which Bichler had contracted for.
(4) ... More than $3,000 in advance tickets had been sold to Jesus Christ Superstar ... slated to open January 28th. (Inferring, according to plaintiff that these people also would be "waiting in the lurch for their money back.")
(5) Thunder Bird was a cooked chicken,[1] and the place was closed.

After considering the voluminous record compiled during the three and one-half years between the filing of the complaint and its decision, the district court concluded that the plaintiff had not raised a triable issue on either of his claims. The district court determined that the closing of the

---

1. The transcript of the broadcast does not contain any reference to "cooked chicken." In the absence of affidavits or other evidence, I am satisfied it was not included in the WZZM broadcast.

only dinner theater in Western Michigan was a newsworthy event, as had been its opening and continued operations. Exhibits were filed which showed substantial media coverage of those events. Bichler's financial condition as the reported "owner" and "manager" of the theater was closely related to the financial condition of the theater and the story of its closing. Concerning the "private facts" claim the district court concluded that the reference to Bichler's financial condition was neither highly offensive nor made "for its own sake," and was privileged under Michigan law.

The district court made alternative findings with respect to the "false light" claim. It concluded that Bichler was a public figure at least in the context of the theater business and that WZZM could not be held liable under Michigan law in the absence of a showing of actual malice. In the alternative the court found that even if Bichler were found to be a private person he was not entitled to a trial without demonstrating that "evidence exists which creates a legitimate fact issue over whether WZZM knew that its broadcast would place plaintiff in a false light, or with reckless disregard of that result." The court found that Michigan applies the same actual malice standard to claims of private individuals regardless of whether they are based on libel or on placing the plaintiff in a false light. After examining all the affidavits and discovery materials the district court concluded that the plaintiff had failed to come forward with evidence showing that WZZM acted with a "high degree of awareness of the probable falsity" of the report, or with "serious doubts" concerning its truth. To the contrary, this examination revealed that no one had told Rummel that his information concerning Bichler's financial condition was false or that the circumstances surrounding the closing of the theater as reported by him were incorrect. On the other hand, Rummel checked the theater and found it closed, checked the facts with outside sources, attempted to contact Bichler for confirmation and, on January 22nd, made a personal check of public records which revealed that there were outstanding claims against Bichler or businesses controlled by him.

**B.**

On appeal Bichler argues that the statements in the broadcast were not privileged under Michigan law because they were not made in good faith, that the comments on Bichler's personal finances were outside the scope of the privilege, that the district court erred in treating him as a public figure, and that summary judgment was improper because there were material issues of fact to be decided by a jury. In response WZZM argues that the broadcast concerned a newsworthy subject, that Bichler's financial difficulties were a legitimate part of the broadcast and that such broadcasts are accorded a qualified privilege under Michigan law. The defendant now concedes that Bichler is not a public figure, but asserts that this makes no difference because the broadcaster's privilege is lost only upon a showing of "actual malice" regardless of whether the plaintiff is a public figure or a private individual. WZZM further contends that summary judgment was proper because, in response to its motion, Bichler produced no evidence that the broadcast was made with actual malice.

**III.**

Consideration of Bichler's claim and WZZM's defense involves two distinct questions, and they must be considered separately.

 The first question is whether WZZM was entitled to the privilege it claimed. The existence of the privilege is a question of law, to be determined by the court upon examining the "occasion" of the publication. The "occasion" refers to the extrinsic circumstances in which the broadcast was made. *Lawrence v. Fox,* 357 Mich. 134, 139–40, 97 N.W.2d 719 (1959); *Peisner v. Detroit Free Press, Inc.,* 82 Mich.App. 153, 163, 266 N.W.2d 693 (1978). If it is concluded that WZZM was entitled

to the privilege, the second question is whether the privilege was lost through abuse, that is, by publishing the story of the theater's closing with actual malice. This is a question of fact.

### A.

In defamation actions Michigan has long recognized the common law defense of privileged communication. Although the claim in the present case is for invasion of privacy rather than libel, the Restatement of the Law recognizes that the same qualified privilege applies to the two types of claims. See *Restatement (Second) of Torts*, § 652G, comment a. ("[u]nder any circumstances that would give rise to a conditional privilege for the publication of defamation there is likewise a conditional privilege for the invasion of privacy.") Bichler does not dispute that Michigan follows this rule and requires the same showing of actual malice to overcome the privilege regardless of whether the tort is libel or invasion of privacy.

The Michigan privilege has been described as a qualified one which "extends to all communications made *bona fide* upon any subject-matter in which the party communicating has an interest, or in reference to which he has a duty, to a person having a corresponding interest or duty." *Bacon v. Michigan Central R.R. Co.*, 66 Mich. 166, 170, 33 N.W. 181 (1887). Newspapers and broadcasters have a qualified privilege to report on matters of public interest and the privilege applies equally in actions brought by public and private figures. See *Lawrence v. Fox*, 357 Mich. at 137, 97 N.W.2d 719; *Peisner v. Detroit Free Press, Inc.*, 82 Mich.App. at 160, 266 N.W.2d 693; *Weeren v. Evening News Association*, 2 Mich.App. 74, 77, 138 N.W.2d 526 (1965), *rev'd on other grounds*, 379 Mich. 475, 152 N.W.2d 676 (1967). If the privilege attaches to a published report a newspaper or broadcaster is not liable for untruths, however harmful to the person defamed, unless the privilege has been forfeited for abuse, as by publication with actual malice. *Bacon*, 66 Mich. at 172–73,

33 N.W. 181; *Peisner*, 82 Mich.App. at 163–64, 266 N.W.2d 693.

The district court held that broadcasts concerning the closing of the only dinner theater in Western Michigan dealt with a matter of legitimate concern to the public, particularly in view of the publicity which had attended its opening and its operations. Bichler contends that the district court erred in its determination because it considered only the "occasion" of the broadcast and did not inquire into the "good faith" of WZZM. This argument telescopes the two distinct and separate inquiries into one. Whether the publication is made in good faith addresses the question of malice, not the question of privilege. As the Michigan Supreme Court stated in *Lawrence v. Fox*, 357 Mich. at 140, 97 N.W.2d 719, "In making the determination as to the privilege of the occasion, the malice charged by the plaintiff is not considered." The district court properly determined the question of privilege by reference to the occasion, that is, the circumstances which became the subject of the broadcast.

### B.

The district court did not err in holding that the broadcast was privileged. It dealt with a matter of legitimate public interest. Contrary to assertions made at oral argument, there is no requirement that a publication or broadcast deal with a "public controversy" in order to be privileged. The proper test is whether it deals with matters of public interest. In *Lawrence v. Fox*, 357 Mich. at 141, 97 N.W.2d 719, the court quoted with approval Prosser on Torts, [2d ed], § 95 as follows:

The burden is upon the defendant in the first instance to establish the existence of a privileged occasion for the publication, by proof of a recognized *public or private interest* which would justify the utterance of the words.

(Emphasis added). See also *Peisner v. Detroit Free Press*, 82 Mich.App. at 161, 266 N.W.2d 693 ("Qualified privilege of a newspaper to report on matters of public inter-

est"); *Schultz v. Reader's Digest Ass'n,* 468 F.Supp. 551, 560 (E.D.Mich.1979) ("events of legitimate public interest"). As this court wrote in *Orr v. Argus-Press Co.,* 586 F.2d 1108, 1113 (6th Cir.1978):

> As a story about a matter of public concern, the article is protected under state law by the qualified privilege of "fair comment." *Lawrence v. Fox,* 357 Mich. 134, 97 N.W.2d 719 (1959); *Miner v. Detroit Post and Tribune Co.,* 49 Mich. 358, 363–65, 13 N.W. 773 (1882) (Cooley, J.). *See* Restatement of Torts, §§ 606, 607 at 275–85 (1938). *Accord, Nuyen v. Slater,* 372 Mich. 654, 127 N.W.2d 369 (1964); *Bufalino v. Maxon Brothers, Inc.,* 368 Mich. 140, 153, 117 N.W.2d 150, 156 (1962). Everyone, citizen or reporter, has the right to comment on matters of public importance, and expressions of opinion and even misstatements of fact are not actionable in a libel suit unless made maliciously for the purpose of damaging another's reputation.

We believe WZZM carried its burden of establishing a privileged occasion and that the district court ruled correctly on this issue of law.

## C.

■ The plaintiff next argues that even if the article was otherwise privileged, WZZM's statements concerning his financial situation were not within the "scope" of the privilege. Bichler contends that disclosure of his financial condition was not a matter of sufficient public interest to justify clothing the "occasion" with a privilege and that there was no logical connection between disclosure of his financial condition and the matter of public interest. A similar argument was made and rejected in *Schultz v. Newsweek, Inc.,* 668 F.2d 911, 915 (6th Cir.1982), where the plaintiff contended that he was an "incidental figure" in the article and therefore comments about him were outside the "scope" of the privilege. Bichler relies on *Clark v. American Broadcasting Companies, Inc.,* 684 F.2d 1208, 1216 (6th Cir.1982), *cert. denied,* 460 U.S. 1040, 103 S.Ct. 1433, 75 L.Ed.2d 792 (1983), where a panel of this court

wrote, "The qualified privilege does not extend, however, to plaintiffs who are not the focus of the alleged public interest publication." Upon further consideration we can find no support for this limitation on the qualified privilege of publishers and broadcasters under Michigan law and to this extent *Clark* is disapproved. There is no requirement under Michigan law that the plaintiff be the "focus" of the publication in order for the privilege to attach.

■ That is not to say that the privilege extends to material which defames another and is not reasonably necessary to the development of the privileged subject matter of the publication. There must be some connection, and courts have expressed this requirement in different ways. For example, in the lower courts the plaintiff in *Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974), claimed that even though the general subject matter of the article was of sufficient importance to be privileged the comments about him did not concern a matter of public interest. The court of appeals rejected this claim because the accusations against the plaintiff were "integral to the central thesis" of the article. *Gertz v. Robert Welch, Inc.,* 471 F.2d 801, 806 (7th Cir.1972). The Supreme Court approved this holding. *Gertz,* 418 U.S. at 331 n. 4, 94 S.Ct. at 3002–3003 n. 4. Similar reasoning may be applied to the present case. Bichler was publicly identified as the "owner" and the "manager" of the theater. Moore told Rummel that Bichler was responsible for payment of past due salaries of the cast and the motel manager told him that Bichler was responsible for the unpaid room charges at the motel. The "central thesis" of the broadcast was that the theater was in financial trouble which caused it to close, and Bichler's financial condition played an integral part in development of this thesis. We do not adopt "integral to the central thesis" of the article or broadcast as the only test. It is illustrative of the requirement that there be a reasonable relationship between the general privileged

subject of the publication and the references to the plaintiff who claims injury.

In summary, we find no error in the ruling by the district judge that WZZM was entitled to a qualified privilege in defense of Bichler's claim. The remaining question is whether the district court correctly held that Bichler failed to present a jury question on the issue of malice.

## IV.

The purpose of the communication privilege is to promote the free and open exchange of ideas. The privilege "provides the publisher a sanctuary of sorts" from the consequences of defamation actions. *Lawrence v. Fox,* 357 Mich. at 137, 97 N.W.2d 719. The publisher is not held to a standard of absolute truth; there is no liability for falsehood unless it is published with malice. We must first determine the proper definition of malice and then decide whether the plaintiff presented a triable issue in response to the defendant's motion for summary judgment.

### A.

A plaintiff who is a public official or a public figure may recover for defamation only upon showing that a publication was made with actual malice, that is, "with knowledge that it was false or with reckless disregard of whether it was false or not." *New York Times Co. v. Sullivan,* 376 U.S. 254, 280, 84 S.Ct. 710, 726, 11 L.Ed.2d 686 (1964). The same constitutional standard applies in actions for invasion of privacy. *Time, Inc. v. Hill,* 385 U.S. 374, 387–88, 87 S.Ct. 534, 541–42, 17 L.Ed.2d 456 (1967). However, where the plaintiff is a private individual the states are free to define the standard of liability so long as they do not impose liability without fault on a publisher or broadcaster. *Gertz v. Robert Welch, Inc.,* 418 U.S. at 347, 94 S.Ct. at 3010.

It seems clear from recent decisions of the Michigan Court of Appeals that Michigan has determined that the definition of actual malice announced by the Supreme Court of the United States in *New York*

*Times Co. v. Sullivan* should be applied to actions such as the present one. See *Gaynes v. Allen,* 128 Mich.App. 42, 47, 339 N.W.2d 678, 680 (1983) ("In Michigan, the *New York Times* standard has been extended to actions brought by private individuals to recover from media defendants for defamatory falsehoods concerning matters of public interest."); *Peisner v. Detroit Free Press, Inc.,* 104 Mich.App. 59, 64, 304 N.W.2d 814 (1981); see also, *Schultz v. Newsweek, Inc.,* 668 F.2d at 918.

While the existence of malice is a question of fact, as with any issue otherwise requiring a jury's determination, the question of malice may become one of law if the defendant moves for summary judgment and the plaintiff fails to establish the existence of a genuine issue as to any material fact. Rule 56(c), Fed.R.Civ.P.; *Schultz v. Newsweek, Inc.,* 668 F.2d at 918 ("the function of summary judgment is to dispose of cases without trial when one party is unable to demonstrate the existence of a fatal dispute which, if present, would require resolution by a jury or other trier of fact.").

We look to the record, then, to determine whether Bichler demonstrated the existence of a genuine issue as to any material fact.

### B.

Bichler argues that there was a genuine issue with respect to a material fact because Kowalczyk testified he told Rummel that Jerry Moore was a "noted liar" and Rummel denied that either Kowalczyk or his attorney made such a statement. An examination of Kowalczyk's deposition does not support Bichler's claim. What Kowalczyk said was that he considered Jerry Moore to be a noted liar, not that he told this to Rummel. Testifying that he asked Rummel to keep the story off the air, Kowalczyk said to his questioner, "... you know, he got all his information from Jerry Moore, and Jerry Moore is a noted liar, anyway, ..." Contrary to Bichler's claim, neither he nor any other deponent or affiant stated that he advised

Rummel that Moore was untrustworthy. Further, the evidence is uncontradicted that Rummel questioned members of the cast and the motel manager, all of whom verified the version given by Moore. It is also uncontradicted that Rummel tried repeatedly to contact Bichler for his version and eventually went to the theater and found it locked and dark. Bichler failed to produce any evidence that Rummel should have believed Moore was lying.

Bichler also contends that the broadcast stated that the dinner theater was closed permanently whereas all Rummel had been told was that the current production was cancelled and the next one would not open on schedule. The corporation which owned the theater is not a party to this action and it is difficult to see how this error in the broadcast, if it was error, put Bichler in a false light. However, at this point in the inquiry we are not concerned with whether the entire broadcast was truthful. Once it has been determined that the broadcast is privileged the court does not speculate on whether it is truthful; it only looks to see if the defendant has lost its qualified privilege by making knowingly false statements or making statements with reckless disregard of whether they were false. *Lins v. Evening News Ass'n,* 129 Mich.App. 419, 436, 342 N.W.2d 573 (1983). The broadcast referred only to the fact that the theater locked its doors, leaving the cast of "Hair" and "Jesus Christ Superstar" stranded, and leaving advance ticket holders for "Superstar" in the lurch. The fact that some listeners might interpret this as meaning the theater was closing permanently is not in any way probative of the issue of malice.

Bichler also asserts that summary judgment was improper because depositions of some possible witnesses had not been taken and their testimony might shed light on "unresolved material issues." The motion for summary judgment was filed by WZZM on July 25, 1980. The order granting summary judgment was entered on October 22, 1981. Both before and after WZZM filed its motion the parties actively pursued dis-

covery, and many depositions were filed. On September 2, 1980 the district court denied a motion by WZZM for a protective order to prevent Bichler from taking certain depositions. There is no indication in the record that the district court ever limited Bichler's discovery or that Bichler ever sought to avoid submission of WZZM's motion on the ground that discovery had not been completed.

Finally, Bichler contends that summary judgment is improper where malice is the issue because "the subjective knowledge" of Rummel is material and malice may be inferred from proof of other facts. This argument is addressed to the first part of the *New York Times* test—published with actual knowledge of falsity. The Michigan Court of Appeals has affirmed summary judgment in libel actions where the controlling issue was whether a media defendant has lost its qualified privilege by publishing with actual malice. See *Lins v. Evening News Ass'n,* 129 Mich.App. at 437, 342 N.W.2d 573. The contrast between the present case and *Arber v. Stahlin,* 382 Mich. 300, 170 N.W.2d 45 (1969), cited by Bichler, where the Supreme Court of Michigan reversed summary judgment for media defendants, is striking. There, very detailed and specific affidavits pointed to the existence of a genuine issue of fact on the question of actual malice. That is not the case here. The affidavits and depositions are conclusory. Finally, the fact that a person's mental state is involved does not preclude summary judgment in a federal court applying Rule 56, Fed.R.Civ.P. Senior District Judge Ralph Freeman dealt with a similar argument in *Schultz v. Reader's Digest Ass'n.,* 468 F.Supp. 551, 564 (E.D. Mich.1979):

Although the Court recognizes that Michigan courts have generally held that actual malice is a jury question, *Lawrence v. Fox, supra,* federal courts applying Rule 56 have granted summary judgment in cases involving subjective intent, including libel cases involving questions of malice. See generally, 6, Pt. 2. Moore's Federal Practice ¶ 56.17[1]

*Cervantes v. Time, Inc.,* 464 F.2d 986 (8th Cir.1972), cert. denied 409 U.S. 1125, 93 S.Ct. 939, 35 L.Ed.2d 257 (1973).

*Accord, Schultz v. Newsweek,* 668 F.2d at 917.

We find nothing in this record which raises a factual question of whether Rummel made the broadcast with knowledge that the statements about Bichler were false.

The alternative basis for a finding of malice under the *New York Times* test is that a publication is made "with reckless disregard of whether it is false or not." The requirements for establishing malice by proof of reckless disregard were set forth in *St. Amant v. Thompson,* 390 U.S. 727, 731, 88 S.Ct. 1323, 1325, 20 L.Ed.2d 262 (1968):

> These cases are clear that reckless conduct is not measured by whether a reasonably prudent man would have published, or would have investigated before publishing. There must be sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of his publication. Publishing with such doubts shows reckless disregard for truth or falsity and demonstrates actual malice.

Again, we find nothing in the record which indicates that Rummel or WZZM "in fact entertained serious doubts as to the truth" of the broadcast.

As has been pointed out, Michigan has long recognized the desirability of public comment on issues of legitimate public interest. This is the reason for its common law communication privilege. By adopting the constitutional standard for measuring malice when a private individual claims injury from a publication or broadcast about a privileged matter of public interest Michigan has given further recognition to the necessity for a free play of ideas in an open society. WZZM established its right to rely on the privilege in this case, and Bichler failed to raise a genuine issue of abuse.

## V.

The dissent of Judge Weick requires a response. It is written as if Michigan had chosen to adopt some standard other than the one established in *New York Times v. Sullivan* for defamation and invasion of privacy actions by private individuals against media defendants. *Gertz* permits a state to establish a less stringent standard, but Michigan has not done so. We noted Michigan's move from common law "actual malice" to the *New York Times* standard in *Schultz v. Newsweek:*

> The privilege of fair comment is not absolute, but may be lost by abuse. It is lost if the utterance or publication is made with actual malice. *Lawrence v. Fox, supra,* 357 Mich. at 141, 97 N.W.2d 719. Though "actual malice" was equated with bad faith, ill will and personal hostility at one time, more recent Michigan decisions have indicated clearly that the definition of *New York Times* has been adopted. Compare *Lawrence v. Fox, supra,* 357 Mich. at 141, 97 N.W.2d 719 with *Arber v. Stahlin,* 382 Mich. 300, 308, 170 N.W.2d 45 (1969), *cert. denied,* 397 U.S. 924, 90 S.Ct. 927, 25 L.Ed.2d 103 (1970), and *Peisner v. Detroit Free Press,* 104 Mich.App. 59, 64, 304 N.W.2d 814 (1981). Thus the district court properly based its decision only on evidence which would support a claim that the defendants acted with knowledge that the statements objected to were false or with reckless disregard of whether they were false or not.

668 F.2d at 918. To suggest at this late date that the Michigan Supreme Court would revert to the *Lawrence* standard— enunciated before *New York Times v. Sullivan*—ignores not only *Schultz* but also Michigan appellate decisions.

The dissent fails to explain why we should ignore the forthright announcement of the Michigan Court of Appeals in recent decisions that

> since federal decisions like *New York Times v. Sullivan,* supra, and its progeny, Michigan now follows what is referred to as the *New York Times* stan-

dard of actual malice, that is, publication with knowledge of falsity or in reckless disregard of whether it was false or not. *Lins v. Evening News Ass'n*, 129 Mich. App. 419, 434, 342 N.W.2d 573 (1983). *See Gaynes v. Allen*, 128 Mich.App. 42, 47, 339 N.W.2d 678, 680 (1983); *Peisner v. Detroit Free Press, Inc.*, 104 Mich.App. 59, 64, 304 N.W.2d 814 (1981); *Wynn v. Cole*, 91 Mich. App. 517, 523, 284 N.W.2d 144 (1979). *Cf. Arber v. Stahlin*, 382 Mich. 300, 170 N.W.2d 45 (1969). As the dissent itself points out, this court is bound to follow considered pronouncements of state law by state appellate courts absent indication from the state's highest court that a contrary rule would be adopted.

The dissent argues for a rule which would so chill the activities of news dispensers as to render them toothless tigers. Rummel was reporting that day's news on January 21, 1979. He made several attempts to contact Bichler, without success, and then actually drove to the theater to find out for himself if it had closed, as reported by Moore. He found a dark theater. When Kowalczyk went to the studio shortly before air time he did not deny the truth of the report of the theater's closing. All he did was to ask Rummel not to run the story as a personal favor to him.

The financial problems of both Bichler and the theater (and of Kowalczyk) already existed when Rummel came on the scene. Contrary to the dissent's version, these problems were not created by the broadcast. Kowalczyk had a large investment in the theater which he was in danger of losing. The dissent would apparently favor a rule that a reporter who obtained all the verification available must nevertheless kill a story of general public interest believed to be true in order to protect the investment of an acquaintance. Kowalczyk gave no real reason; his vague reference to Moore's alleged unreliability and his unsubstantiated belief that Bichler could clear things up did not require Rummel to withhold the story.

The dissent would also apparently require the media to "unscramble the egg" in each story, separating out all that might be personally embarrassing to anyone involved. The matter of Bichler's personal finances was so intertwined with the story of the theater's problems that the two were inseparable. To require such a parsing of information would be absurd. A story must be presented, as nearly as possible, in its entirety so the reader or listener receives it as an intelligible whole rather than as fragments.

The dissent implies that Bichler called Rummel between the two broadcasts and attempted to stop the second one. This is completely unsupported by the record. The reference to his call is so vague that it could not be treated by the district or this court as having established excessive publication, as argued by the dissent.

Michigan has struck a balance between the public's right to be informed on matters of general interest and each individual's right of privacy. In doing so Michigan determined that a media defendant shall be held liable only upon a showing of publication with actual knowledge of falsity or in reckless disregard of the truth or falsity of matters published. The dissent would alter that balance by lowering the threshold which a private plaintiff must cross in order to recover. This court may not change the balance which the State has adopted.

The judgment of the district court is affirmed.

KEITH, Circuit Judge, with whom GEORGE CLIFTON EDWARDS, Jr., Circuit Judge, joins, concurring in part and dissenting in part.

I concur in the result reached by the majority. However, I cannot join in that part of the opinion which disapproves of language set forth in *Clark v. American Broadcasting Companies, Inc.*, 684 F.2d 1208, 1216 (6th Cir.1982), *cert. denied*, 460 U.S. 1040, 103 S.Ct. 1433, 75 L.Ed.2d 792 (1983).

A panel of this Court in *Clark* stated, "the qualified privilege does not extend, however, to plaintiffs who are not the fo-

cus of the alleged public interest publication." 684 F.2d at 1216. The majority would have us believe that this requirement has no basis in Michigan law. To the contrary, a majority of the panel in *Clark* specifically relied upon the Michigan Supreme Court's opinions in *Bowerman v. Detroit Free Press*, 287 Mich. 443, 283 N.W. 642 (1939) and *Timmis v. Bennett*, 352 Mich. 355, 89 N.W.2d 748 (1958) in support of a "focus" requirement. In *Timmis*, the Michigan Supreme Court held, in effect, that in order for a qualified privilege to apply, the alleged defamatory statement must be limited in its scope to that which is in the public interest. 352 Mich. at 369, 89 N.W.2d at 755. This holding was an elaboration on what the court had said two decades earlier in *Bowerman*. The defendant in *Bowerman* published a newspaper article concerning a judicial proceeding. The article was inaccurate, and contained libelous language. Nevertheless, the defendant argued that there was a qualified privilege to report on judicial proceedings. The court first recognized that the "extrinsic circumstances in the instant case are that defendant's newspaper was reporting a judicial proceeding which created a qualified privilege." 287 Mich. at 447, 283 N.W. at 644. The *Bowerman* court then held that the newspaper article was not within the scope of the qualified privilege.

A requirement that the privilege apply only to individuals who are the focus of the publication, clearly falls within the parameters of the language set forth in *Timmis* and *Bowerman*. Focus is simply another way of stating there must be a reasonable relationship between the controversy and the individual for the privilege to apply. Indeed the majority concedes there is a need to establish, in some fashion, this relationship. "There must be some connection [between the defamatory material and the public interest publication], and courts have expressed this requirement in different ways." Maj.op. at 1012. As an example the majority refers to *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974). In *Gertz*, the Seventh

Circuit found that accusations against the plaintiff set forth in an article were "integral to the central thesis of the article" and, therefore, the privilege applied. *Gertz v. Robert Welch, Inc.*, 471 F.2d 801, 806 (7th Cir.1972), *cert. denied*, 459 U.S. 1226, 103 S.Ct. 1233, 75 L.Ed.2d 467 (1983). The Supreme Court upheld this analysis. *Gertz*, 418 U.S. at 331 n. 4, 94 S.Ct. at 3002 n. 4. To my way of thinking, "integral to the central thesis" is not so distinguishable from "focus" as to warrant this Court's disapproval. These are only two of what would seem to be many ways for expressing the need to establish a relationship between the controversy and the privilege.

Because of the majority's insistence upon challenging this portion of *Clark*, I cannot join in the majority opinion.

It is so ORDERED.

NATHANIEL R. JONES, Circuit Judge, dissenting.

I must respectfully dissent from the majority's holding on the scope of Michigan's qualified privilege for reporting on matters of public interest. There is no dispute that Michigan law provides such a privilege to the media when reporting on matters of public interest even when they involve stories about private individuals. *Peisner v. Detroit Free Press*, 82 Mich.App. 153, 266 N.W.2d 693 (1978). When properly invoked, this privilege shields the media from liability for publishing private information about a private individual or placing a private individual in false light absent a showing of actual malice, ie., that the publication was made "with knowledge that it was false or with reckless disregard of whether it was false or not." *Peisner*, 82 Mich.App. at 163, 266 N.W.2d at 698.

It is equally clear that this qualified privilege is not unlimited in scope such that the media may publish any information it so desires. Instead, a statement is privileged only to the extent that it is limited in its scope to the public issue addressed in the publication. *Timmis v. Bennett*, 352 Mich. 355, 369, 89 N.W.2d 748, 755 (1958). The

majority defines the scope of the privilege as extending to all statements which bear a reasonable relationship to the general privileged subject matter of the publication. The majority concludes that the statements about Bichler's *personal* financial condition played an "integral part" in the development of the "central thesis" of the broadcast, i.e., the theater's financial troubles. *Supra*, at 1012. Although this definition of the scope of Michigan's qualified privilege may be preferred by the majority, our task in this case is not to define the scope of the privilege ourselves, but to ascertain how the Michigan Supreme Court would define the scope. *See City of Aurora v. Bechtel Corp.*, 599 F.2d 382, 386 (10th Cir. 1979). Granted this task is made more difficult by the apparent dearth of Michigan caselaw defining the limits of the privilege. As Judge Weick points out in his dissent, however, we are not unguided in our attempt.

The right to withhold embarrassing private facts from public view and the right not to be placed in a false light are both encompassed within the constitutionally protected right to privacy. *See Pallas v. Crowley, Milner & Co.*, 322 Mich. 411, 33 N.W.2d 911 (1948). Defining the proper scope of Michigan's qualified privilege requires a balancing between the individual's right to privacy and the public's need to know. *Peisner*, 82 Mich.App. at 161–63, 266 N.W.2d at 697–98. In *Weeren v. Evening News Association*, 379 Mich. 475, 152 N.W.2d 676 (1967), the Michigan Court reversed a grant of summary judgment and remanded for trial on the plaintiff's action for defamation and invasion of the right to privacy. While recognizing therein that an individual could waive his right to privacy, it was written that such waiver

> carries with it the right to an invasion of privacy only to such an extent as may be legitimately necessary and proper in dealing with the matter which has

brought about the waiver. [The right to privacy] may be waived for one purpose, and still asserted for another...

379 Mich. at 502, 152 N.W.2d 676 (Black, J.). It is clear that Bichler waived his right to privacy insofar as it relates to his management of the theater and any statements concerning the theater's problems are appropriately shielded by Michigan's qualified privilege. It is equally clear that Bichler has never done anything which could be construed as waiving his right to privacy concerning his personal financial affairs. Thus statements concerning Bichler's personal finances are not shielded by the privilege and the district court erred in requiring him to prove that these statements were published with malice. Accordingly, I would reverse the grant of summary judgment and remand for trial under the proper standard of liability.

KRUPANSKY, Circuit Judge, with whom NATHANIEL R. JONES, Circuit Judge, joins, dissenting.

Because the majority has erroneously concluded that the state qualified privilege of fair comment applies to the WZZM reports on Bichler's personal financial affairs, I must respectfully dissent. Inasmuch as the salient facts have been accurately compiled in the majority opinion and in Judge Weick's dissent, their duplication at this point would serve no useful purpose.

Michigan has long recognized the venerable doctrine of a qualified privilege of fair comment.[1] *See, e.g., Miner v. Detroit Post & Tribune Co.*, 49 Mich. 358, 13 N.W. 773 (1882). The "doctrine of qualified privilege may properly be regarded as including statements made in good faith by a citizen of the community having, or claiming to have, special knowledge or information bearing on such matters of public concern and communicated to others concerned or interested". *Timmis v. Bennett*, 352 Mich.

**1.** The fair comment privilege is of ancient origin and was treated as needful of little explication in *Toogood v. Spyring*, 149 Eng.Rep. 1044 (Ex.1834); therein it was observed that a publication is privileged when it is, fairly made by a person in the discharge of some public or private duty, whether legal or moral, or in the conduct of his own affairs, in matters where his interest is concerned.

355, 369, 89 N.W.2d 748, 755 (1958). In *Timmis v. Bennett*, the unanimous state supreme court identified six elements of the qualified privilege: (1) a good faith communication, (2) a cognizable interest to be upheld, (3) a communication which is limited in scope to the interest advanced, (4) a proper occasion for the publication, (5) a publication in the proper manner, and (6) a publication only to appropriate parties.

The *Timmis v. Bennett* court further held that the existence of the privilege was an issue of law. However, once the existence of the privilege was established, the plaintiff would bear the burden of demonstrating actual malice. The issue of actual malice becomes a jury question if the evidence merely raised a probability of malice.[2] 89 N.W.2d at 753 (citing *Bacon v. Michigan Central R.R. Co.*, 66 Mich. 166, 33 N.W. 181 (1887)).

Primarily, Bichler challenges the existence of (a) the station's cognizable interest in his personal financial affairs, and (b) a communication limited in scope to the interests advanced.

Bichler contends that, in order for WZZM–TV to have had a legitimate interest which would immunize its report, there must have been a "logical nexus" between the theater and his personal financial condition. The majority opinion conducts no real analysis of this issue. Instead, the majority merely concludes that because the broadcast "deal[t] with matters of public interest.... WZZM carried its burden of establishing a privileged occasion". Maj.op. at 1012. Thereafter, the majority reluctantly concedes "[t]here must be some connection" between the individual finances and the theater, *id.* at 1012, and in a conclusory summary states that "Bichler's financial condition played an integral part in" the subject of the broadcast. *Id.* at 1012. Thus, the majority has conveniently

assumed, without factual support, the relevance of Bichler's financial condition, which was the precise issue presented to the *en banc* court.

It must be conceded that, absent the closing of the theater, Bichler's personal financial predicament would not have been subject to the fair comment privilege. Accordingly, to invoke the privilege, WZZM was mandated the burden of proving a rational relationship between the closing of the theater and Bichler's private affairs. Manifestly, no such proof appears on the appellate record.

The Thunder Bird was a corporation. Bichler was merely a shareholder. He was not the sole owner of the theater. Further, WZZM was acutely aware of the fact that Bichler was not either the *de facto* or *de jure* owner of the theater.[3]

Additionally, the record is significantly devoid of *any* inference that Rummel obtained or attempted to obtain *any* information whatsoever connecting Bichler's personal affairs to the corporate affairs of the Thunder Bird. It is hornbook law that a corporation is a distinct legal entity apart from its shareholders and I can discern no rational relationship between the activities of a corporation and the financial affairs of its shareholders.

Rummel used the artifice of the theater's closing to publicly humiliate Bichler with an unverified assumption that the individual's asserted financial straits had resulted in the closing of the Thunder Bird, leaving innocents "in the lurch". As a result, Bichler was visited with immediate, devastating and insurmountable economic repercussions from his personal creditors.

The "thesis" of the news report was not, as the majority erroneously and without support hypothecates, "that the theater was in financial trouble which caused it to close". Maj.op. at 1012. Instead, Rum-

**2.** To the extent that Judge Weick's dissent asserts a factual issue as to the existence of malice arising from the Bichler deposition testimony, I join with Judge Weick in urging that summary judgment was an inappropriate vehicle for disposing of this case. The majority's bland assertion that the testimony was vague and insufficient is a mechanism of avoidance.

**3.** As the majority noted, when Kowalczyk asked Rummel to delay the report, Kowalczyk did so as a result of his shareholder interest in the Thunder Bird. Maj. op at 1016.

mel's "story" was that Bichler's personal turmoil had somehow impacted the viability of the Thunder Bird. As previously noted, no individual ever suggested this connection to Rummel and no attempt was made by Rummel to verify the severe implication of the newscast's integration of Bichler's personal finances in the report on the theater's closing. Bichler's personal integrity was called into question by the news report and he was cast in a negative and false light before his community. Without having provided even the most remote justification to include the plaintiff's alleged personal misfortunes in a report about the corporation, WZZM failed to demonstrate the cognizable interest necessary to invoke the common law privilege. I would therefore reverse the trial court's contrary determination.[4]

In reaching this result, I would not characterize news reporters as "toothless tigers", since I am mindful of the important role that the media serves in today's society. However, as must all societal institutions, it must employ its important privileges with an equally crucial regard for the responsibility inherent in its power. In this case this journalist acted not only unprofessionally, but with a willful disregard for the facts and circumstances of the case, and in such an irresponsible manner as to cause severe damage and irreparable injury to the plaintiff. Such willful disregard should not and is not condoned, whether in the common law, state or federal enactments, within the context of this case. Accordingly, I respectfully dissent.[5]

WEICK, Senior Circuit Judge, dissenting:

I respectfully dissent. The district court erred grievously in granting summary judgment in favor of the Defendant-Appellee T.V. station and against the Plaintiff-Appellant Richard Bichler, a private and not public figure; and in requiring Bichler to prove actual malice to recover. Bichler's right to privacy guaranteed by the Constitution of the United States, as well as by Michigan law, was grossly violated by the ruling of the district court. Bichler's theatre corporation, and Bichler personally were rendered insolvent, and Bichler's privacy was irresponsibly and irreparably invaded, as a direct and proximate result of the false, defamatory and libelous broadcasts of the T.V. station instigated by one Jerry Moore, who did not tell the truth. The T.V. station, which refused to print a retraction or even to discuss the story with Bichler, either knew it was false, or in the exercise of ordinary and reasonable care and good faith could have ascertained that it was false, defamatory and libelous by making an appropriate investigation. The station failed and neglected to properly carry out such investigation.

In my opinion, neither the United States Constitution nor Michigan law permit the withdrawal in this case of Bichler's right to privacy from the protection afforded by Michigan to unreasonable invasions of that right. The truth is that Bichler did sufficiently prove malice, and that there were factual issues which Bichler was entitled to have submitted for determination by a jury at trial. It was error for the district court to undertake to determine them as a matter of law, and it is error for this court to affirm the district court's grant of summary judgment.

## I.

Surely Richard Bichler never imagined that hiring Jerry Moore and his production

---

**4.** The majority insists that it would not have been possible to report the putatively legitimate story—the theater's closing—without the egregious commentary upon Bichler's personal affairs. Maj. op. at 1015. This is another example of the majority's predeliction for assuming the conclusion. In fact the two items were *not* inseparable. The Thunder Bird's relationship with Playmoore Productions—the impetus for the story—was obtained from Moore; the plight of Bichler personally was revealed by court records. Thus, the sources, as well as the substance, of the items were distinct. Justicious editing of the broadcast could have avoided this lawsuit. Instead, an over eager television reporter invented connections without justification and aired a damaging unverified news report. No privilege should prevent WZZM from being held accountable for the resulting losses.

**5.** I also join fully Judge Jones' eloquent dissent.

company to stage plays at the Thunderbird Dinner Theatre would result in the theatre's untimely demise. The public interest in the opening and operations of the Thunderbird, as evidenced in the coverage given the theatre and its shows by the local media, adequately documents the benefit to Grand Rapids from Bichler's ill-fated attempts to contribute to the cultural diversity of the community.

And so it was, when on January 21, 1979, the theatre gave Jerry Moore a check for $9000 for the services of the cast and for their expenses for the previous week. The court notes that it was this check upon which Bichler stopped payment. The reasons for this exercise of purely private business judgment, however, are ignored by the majority: Bichler stopped payment because at about the time that the check was issued, a garnishment pursuant to a judgment rendered against Moore in Flint, Michigan, was served upon Bichler for indebtedness of Moore and his Playmore Productions; and because Bichler also evidently became aware that certain of Moore's invoices submitted for payment were not true invoices.

Apparently there was no written contract governing Moore's obligations to the Thunderbird Dinner Theatre. However, testimony before the district court indicated that it was Moore, not Bichler, who was responsible for paying the gross costs, travel expenses and lodging of the cast. Bichler would then remit a portion of the play's proceeds to Moore, from which Moore would recover his costs, with the remainder representing the profits of Playmore Productions.

It was not Bichler, but the disgruntled liar Moore, who decided to unilaterally announce that the theatre's present production of "Hair" was to be cancelled. Moore, of course, held a press conference to make sure that his announcement about the decision to terminate production would place Bichler in the most unfavorable light. James Rummel, the news anchorman from WZZM–TV, whom Moore invited to attend, took what Moore told him at face value.

After confirming what Moore reported only with some of the members of Moore's production company and the "innkeeper," unsuccessfully attempting to contact Bichler only in Grand Rapids from where he had departed, and finding locked doors at the theatre, Rummel prepared for WZZM's 11:00 newscast.

What happened between Rummel and Bichler's corporate partner, David Kowalczyk, shortly before the broadcast is unclear. It is undisputed that Kowalczyk told Rummel that he had no independent knowledge of the closing. Rummel's affidavit, dated July 24, 1980, stated that Kowalczyk asked that the story not be aired as a personal favor, and that Kowalczyk had not told Rummel the report was false. In Rummel's deposition taken one month earlier, June 17, 1980, he stated that he did not actually remember Kowalczyk telling him the story was false. Kowalczyk stated in his deposition that although he wasn't certain, he felt sure he had told Rummel that Moore's story was not true. Kowalczyk further stated that Rummel told him "he [Rummel] was making news, that was his job." In any event, Rummel's broadcast about the closing of the Thunderbird went on as planned, reporting not only on the closing of the show, but on Appellant Bichler's personal financial problems, his contractual unreliability as related by the production members, and his seeming penchant for leaving everyone involved with the Thunderbird Dinner Theatre, including the advance ticket holders, "in the lurch."

Rummel was not totally insensitive to the fact that the substance of his broadcast made substantial danger to Bichler's reputation apparent. Prior to "repackaging" the broadcast for the next day's 5:30 newscast, Rummel again attempted to contact Bichler, unsuccessfully, and also checked the public records which showed lawsuits filed against Bichler and some liens filed against his assets. The second broadcast of the story, however, found its content essentially unchanged.

As the majority notes, the day following the second broadcast a local bank called its

loan with the theatre and repossessed personal property covered by security agreements from the theatre premises. Other creditors followed suit, removing equipment which had not been paid for. The building was largely stripped of its contents within a few weeks. Needless to say, the reclaimed property was essential to the financial viability of the theatre, and the Thunderbird Dinner Theatre never reopened its doors to the public.

## II.

Richard Bichler's suit, however, was not founded solely upon the damage inflicted by the broadcasts on the financial viability of the theatre. The cause for invasion of privacy was based upon the damage to Bichler's reputation by the publication of embarrassing private facts, and by placing Bichler in a false light in the public eye. On appeal, the defendants conceded that Bichler was not a public figure but a private individual. I assume the majority agrees that the newscasts touched on personal, private matters.

The court's analysis may be summarized as follows: First, under Michigan law, because the closing of the dinner theatre was a matter of legitimate public interest, and because Bichler's involvement with the theatre, including his personal financial problems and contractual imbroglio with Moore, was reasonably related to the general privileged subject, then WZZM was entitled to a qualified privilege in defense of Bichler's claim. Second, because the only way to defeat this claim under Michigan law was through a showing of actual malice, and since the record presented no triable questions of fact on that issue, the district court correctly granted summary judgment to Appellees.

The effect of the majority's opinion is to leave unprotected the private aspects of a private individual's life, in the absence of a showing of malice, so long as those aspects are "reasonably related" to a matter of public interest. The abrogation of the private individual's right to privacy by this court is grounded in the conclusion that Michigan has chosen to protect (and thereby promote) its vigorous press, at the expenses of hapless victims like Richard Bichler.

It is contended on appeal that because jurisdiction is based on diversity of citizenship, the substantive law of Michigan controls. However, an extensive review of the decisions of the highest court of the State of Michigan leads me to conclude that the Michigan Supreme Court would not strike the same balance that this court has struck in reliance on the Michigan Court of Appeals, and that invasions of privacy like those suffered by Appellant Bichler are entitled to far greater protection than this court's resolution affords. In so concluding, I first direct the court's attention to the decisions of the Supreme Court of the United States, not for a statement on the controlling substantive Michigan law, but for instructive guidance to those issues with which this court must concern itself to properly resolve Mr. Bichler's claim.

### A.

The Supreme Court's attempt to reconcile the law of defamation with the First Amendment was first elaborated in *New York Times Co. v. Sullivan, supra,* in which it held that a publisher of defamatory falsehoods about a public official is constitutionally protected from liability for defamation unless actual malice is proved. This principle was extended to cases involving defamed public figures in *Curtis Publishing Co. v. Butts,* 388 U.S. 130, 87 S.Ct. 1975, 18 L.Ed.2d 1094 (1967). In *Rosenbloom v. Metromedia, Inc.,* 403 U.S. 29, 91 S.Ct. 1811, 29 L.Ed.2d 296 (1971), a plurality concluded that the *New York Times* protection should extend to defamation of private persons if the defamatory statements concerned matters of public or general interest.

*Rosenbloom's* protection, however, was short lived, and the "matters of public or general interest" test was overruled by a majority in *Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974). A brief recitation of those facts is

in order. Elmer Gertz, a reputable attorney, was retained by a family to represent them in civil litigation against a Chicago policeman who killed their son. Respondent, the publisher of a John Birch Society monthly called American Opinion, branded Gertz as a Communist and the architect of a "frame-up" involving the policeman. Petitioner Gertz's diversity action claimed injury to reputation, and respondent asserted it was entitled to invoke the *New York Times* privilege against liability for defamation, since Gertz was a public official or a public figure and the article concerned an issue of public interest or concern. Because the Supreme Court held that Gertz was not a public official or figure (as was conceded in the case at bar about Bichler), the principal issue decided in *Gertz* was whether a newspaper or broadcaster that publishes defamatory falsehoods about a private individual may claim the *New York Times* privilege against liability for the injury inflicted by those statements.

In holding that the publisher was not so entitled to the *New York Times* privilege, the *Gertz* Court begins with the proposition that although the false statement of fact is not worthy of constitutional protection, it is inevitable in free debate, and therefore, the First Amendment requires that some falsehoods be protected to protect the speech that matters. The need to avoid self-censorship by the news media, however, is not absolute; the First Amendment protection must be balanced against the legitimate state interest underlying the law of libel that individuals be compensated for the harm inflicted on them by defamatory falsehoods.

The holding in *Gertz* is based on the conclusion that the states' interest in preventing and redressing injury to the reputation of private individuals requires a different rule than with respect to public figures and officials. This is so because, unlike public officials and figures, a private individual enjoys lesser access to effective channels of communication and is therefore more vulnerable to injury. Furthermore, the private individual has not voluntarily injected himself into the forefront of the affairs of society, and has not relinquished any part of his interest in the protection of his own good name. Therefore, the *Gertz* Court concluded that the "public or general interest" test for determining the applicability of the *New York Times* standard to private defamation inadequately serves the competing state and First Amendment interests, and thereby overruled *Rosenbloom*.

### B.

The majority opinion, formalistic in its citation of precedent and authority, "ignore[s] the important social values which underlie the law of defamation. Society has a pervasive and strong interest in preventing and redressing attacks upon reputation." *Rosenblatt v. Baer,* 383 U.S. 75, 86, 86 S.Ct. 669, 676, 15 L.Ed.2d 597 (1966). Yet this court is seemingly bound to ignore this important societal value if, as a federal court sitting in diversity jurisdiction, Michigan has likewise chosen to ignore the rights of its private citizens to redress attacks upon their reputation by the news media, in the absence of proving malice. It is my opinion, however, that the courts of Michigan have not ignored that state's pervasive and strong interest in *preventing* and *redressing* attacks upon private reputations, but to the contrary, have displayed acute sensitivity to the importance of the rights of private individuals like Richard Bichler.

As early as 1878, the great Michigan jurist Thomas Cooley stated in *The Elements of Torts* of personal immunity, that "[t]he right to one's person may be said to be *a right to be let alone.*" Furthermore, the individual's right to privacy specifically has been recognized and protected by the Michigan Supreme Court in such cases as *Weeren v. Evening News Association,* in which Justice Black notes:

> As one reads contemplatively through the cases and reviews dealing with the right of action for invasion of privacy, it comes to him more and more that the defense (where there is a defense and a

defense is needed) is regarded as a *waiver* by the plaintiff of his asserted right, not a *privilege* of the defendant to intrude upon or disturb that right.

379 Mich. at 502, n. 14, 152 N.W.2d 676. *See also* 379 Mich. at 500–502, 152 N.W.2d 676; *Gertz, supra,* 418 U.S. at 345, 94 S.Ct. at 3009.

The majority's determination that the private contractual and financial transactions of Bichler and the theatre fall within the scope of Michigan's qualified privilege, since reasonably related to a matter of legitimate public concern, is predicated neither on the policy underlying nor the rationale behind the decisions of the Michigan courts. For example, in *Gaynes v. Allen, supra,* the defendant published an article written by a patient of the plaintiff which was highly critical of the optometric treatment plaintiff provided the patient. According to the plaintiff, the article contained numerous misstatements concerning the patient's condition and plaintiff's conduct, and as a result of the article's publication, his professional reputation had suffered greatly. In affirming the lower court's grant of defendant's motion for directed verdict, the Michigan Court of Appeals held that "a private individual who seeks recovery from a media defendant *for defamatory falsehoods which relate to a matter of legitimate public concern* may not recover without proof [of malice]." 128 Mich.App. at 51, 339 N.W.2d 678. (Emphasis added). In so holding, the Court of Appeals stated:

> The published information related to treatment rendered by plaintiff optometrist, who allegedly failed to recognize a medical problem beyond his level of competence. Ophthamologists and the general public have a vital interest in the proper delivery of eye care services and in being informed of the level of competence of health care deliverers. The issue to which the allegedly defamatory article addressed itself is one deserving of robust public debate. We hold *that the published information was a matter of legitimate public concern* and

that defendants had a qualified privilege to publish it.

128 Mich.App. at 48–49, 339 N.W.2d 678 (Emphasis added).

In *Gaynes,* the published information was privileged because the information *itself* was a matter of legitimate public concern and the alleged defamatory falsehoods therefore related to a matter of legitimate public concern. This conclusion necessarily follows from the requirement of Michigan law that

> ... having determined [the extrinsic circumstances which create a qualified privilege], an additional step must be taken, namely, the ascertainment of the scope of this privilege.

*Bowerman v. Detroit Free Press,* 287 Mich. 443, 447, 283 N.W. 642 (1939). *See also Timmis v. Bennett,* 352 Mich. 355, 89 N.W.2d 748 (1958). In the case of private individuals, as suggested by Justice Black in *Weeren, supra,* the scope depends on the extent to which the plaintiff has waived his asserted right. Furthermore, as noted in the concurring opinion of Justice Adams in *Weeren:*

> The privilege to disseminate current topical, immediate news of public interest, or about official or public figures, is one thing. The privilege in connection with past events of possible current interest but which do not have to be transmitted to the public in a matter of hours is quite another. *Curtis Publishing Co. v. Butts, supra.* If the privilege is one of a limited or qualified nature, it may be lost through improper conduct.

379 Mich. at 509, 152 N.W.2d 676.

Nowhere does the record indicate that Richard Bichler waived his right of privacy regarding the contractual or financial arrangements between himself and his theatre company and Moore, no doubt since those arrangements were nobody's business but Bichler's and Moore's. Furthermore, the embarrassing disclosures about Bichler placing him in a false light did not comprise the type of "hot" news item about which the public had an immediate right to know. There was no immediacy mandating

release of information regarding an inchoate lawsuit between Bichler and Moore, the subject matter of that lawsuit, or the mere possibility that advance ticket holders would be left "in the lurch." No policy requires that publication of such information should precede sufficient investigation necessary for objective reporting, or that such private portion of the newscast be entitled to the qualified privilege, especially when the substance of the Rummel report made substantial danger to Bichler's private reputation apparent. *See Curtis, supra,* 388 U.S. at 155, 87 S.Ct. at 1991. Nor is it absurd to require the media to separate out the obviously defamatory portions of its story.

Extension of the qualified privilege to the facts of this case is in marked contrast to the other cases relied on by the majority and involving private individuals. *Cf. Schultz v. Newsweek, Inc.,* 668 F.2d 911 (6th Cir.1982) (Lively, J.) (statements regarding alleged underworld criminal activities); *Orr v. Argus-Press Co.,* 586 F.2d 1108 (6th Cir.1978) (Merritt, J.) (statements alleging indictment and arrest of private individual on charges of securities fraud); *Schultz v. Reader's Digest Ass'n.,* 468 F.Supp. 551 (E.D. Mich.1979) (statements regarding alleged underworld criminal activities); *Lins v. Evening News Ass'n.,* 129 Mich.App. 419, 342 N.W.2d 573 (1983) (statements alleging criminal activities of union officials); *Gaynes v. Allen,* 128 Mich. App. 42, 339 N.W.2d 678 (1983) (statements regarding quality of health care provided by plaintiff optometrist); *Peisner v. Detroit Free Press,* 82 Mich.App. 153, 266 N.W.2d 693 (1978) (statements regarding attorney's representation of indigent criminal defendant). *But cf. Clark v. American Broadcasting Companies, Inc.,* 684 F.2d 1208 (6th Cir.1982) (Keith, J.) (no privilege to reports involving plaintiffs not the focus of alleged public interest publication). *See also Bowerman, supra* (no privilege under Michigan law for libelous statements incorrectly reporting judicial proceedings, even though reasonably related to privileged subject matter); *Time v. Firestone,* 424 U.S. 448, 96 S.Ct. 958, 47 L.Ed.2d 154 (1976) (no substantial reason why private individual involved in litigation should forfeit degree of protection afforded by defamation law simply by virtue of being drawn into courtroom).

I do not believe that the Michigan Supreme Court and Court of Appeals would extend to "the publisher a sanctuary" to disseminate false reports about private contractual disputes and financial dealings, on such a thin thread as the reasonable relationship of those disputes and dealings to the matter of legitimate public concern. Such a "rational basis" and "minimal scrutiny" hardly serves to protect Michigan's "pervasive and strong interest in *preventing* and *redressing* attacks upon reputation," and is totally unresponsive to Bichler's claims. By allowing the tangential to gain the protection of the Michigan qualified privilege, this court has improperly converted the standard of immunity from "defamatory falsehoods which relate to a matter of legitimate public concern" to "defamatory falsehoods which relate to a report on a matter of legitimate public concern," and has allowed the media to thereby create rather than merely report on that public concern.

Contrary to the majority's interpretation, I conclude that cases like *Schultz* and *Gaynes* can be reconciled with the policy behind *Weeren* and *Gertz,* if the content of the defamatory or invasionary falsehoods itself addresses a matter of legitimate public concern. Applying the proposed standard to the facts of this case, initially I am confident the majority would agree that if the theatre had not been closing, but if Bichler and Moore still had their contractual dispute, then the dispute alone would not properly be a subject of "legitimate public interest" clothed in the qualified privilege. The gist of Bichler's claim is that the information regarding his personal affairs was defamatory, not the information regarding the closing of the show. The dispute between Moore and Bichler was private, and the invasion of privacy placing Bichler in a false light did not become privileged mere-

ly because it was reasonably related to the privileged subject matter.

The inability of the majority to properly define what matters are of legitimate public concern and therefore qualifiedly privileged is unfortunate but understandable. One of the reasons offered by the Supreme Court in *Gertz* for overruling the "public or general interest" test of *Rosenbloom* under the United States Constitution was that such test would occasion the foreseeable difficulty of forcing state and federal judges to decide on an *ad hoc* basis which publications address issues of public or general interest. 418 U.S. at 346, 94 S.Ct. at 3010. The Supreme Court "doubt[ed] the wisdom of committing this task to the conscience of judges." *Id.*[1] That Michigan chooses such a standard has not proven to make our task any easier.

To conclude that Richard Bichler's claims fall within the scope of Michigan's qualified privilege is to disregard the facts and policy underlying the cases interpreting that privilege, and to ignore the state's strong interest in protecting its private citizens from injuries to reputation from unwarranted invasions of privacy. The courts of Michigan have given us no indication that

1. The majority, *ante,* also misconstrues the Supreme Court's approval of the Seventh Circuit's "integral to the central thesis" test in *Gertz. See* 418 U.S. at 331, n. 4, 94 S.Ct. at 3002–3003, n. 4. Because the accusations against Gertz concerned how he conducted himself in a criminal proceeding, a matter of legitimate public concern, the Seventh Circuit and the Supreme Court determined that the truth or falsity of Gertz's alleged involvement in the criminal proceeding did not affect whether the defamatory statements in fact addressed an issue of general or public interest. This court has missed the critical analytic fact that the only reason Gertz stated the defamatory statement against him concerned no issue of public or general interest was because Gertz did not participate in the criminal proceeding.

 By comparison, Bichler's claim is that his private financial and contractual dealings are not a matter of legitimate public concern in Michigan. This general claim is not predicated upon the truth or falsity of the statements, but on the scope of the privilege.

2. The majority's reliance on Restatement (Second) of Torts, § 652G for the proposition that the conditional privilege arises in Michigan for

they are prepared to strike the balance so one-sidedly in favor of the press, in derogation of the rights of private individuals like Bichler.[2]

## C.

Furthermore, I cannot agree with the majority that the *New York Times* standard is applicable under Michigan law in cases alleging invasion of privacy by embarrassing and false-light falsehoods. The last time that this court applied *New York Times* to a case based on invasion of privacy, *see Cantrell v. Forest City Publishing Co.*, 484 F.2d 150 (6th Cir.1973) (Lively, J.), we were reversed by the Supreme Court. *See Cantrell v. Forest City Publishing Co.*, 419 U.S. 245, 95 S.Ct. 465, 42 L.Ed.2d 419 (1974). Justice Stewart, speaking for eight members of the Court, held that

> [i]n a false-light case, common law malice—frequently expressed in terms of either personal ill-will toward the plaintiff or reckless disregard or wanton disregard of the plaintiff's rights—would focus on the defendant's attitude toward the plaintiff's privacy, *not toward the truth or falsity of the material published.*

the invasion of privacy as for defamation is also misplaced. First of all, the section is new, and has never been adopted by any court of Michigan with which I am familiar. Second, § 652G telescopes the issue, just as the majority has accused Bichler of doing, *ante;* we can't determine under what circumstances the qualified privilege attaches, unless we know the scope of the privilege and those circumstances in which it is lost through abuse.

I am also confused by the court's statement, *ante,* that "Bichler does not dispute that Michigan follows this rule and requires the same showing of malice to overcome the privilege regardless of whether the tort is libel or invasion of privacy," especially in light of the court's description of Bichler's first argument that "the statements in the broadcast were not privileged under Michigan law because they were not made in good faith," and Bichler's argument that the district court erred because it did not inquire into the good faith of WZZM. It seems clear Bichler was arguing for a different standard than malice, and I conclude his argument has merit, *post.*

*See also* the discussion of *Cantrell v. Forest City Publishing Co., post.*

419 U.S. at 252, 95 S.Ct. at 470. (Emphasis added). In this case, the court commits the same reversible error that was committed in *Cantrell*. Based on *Cantrell*, the judgment of the district court must be reversed.

The majority's adoption of the *New York Times* standard, even if modified in accordance with *Cantrell*, would be contrary to this court's recognition in *Orr, supra*, at 1113, that the Michigan Supreme Court has long adopted the commonlaw rather than *New York Times* definition of malice, and has thereby allowed for loss of the qualified privilege through a showing of "bad faith" or ill-will." Thus, under Michigan law, "If the statement 'be honestly believed to be true, and published in good faith,'" there can be no liability. *See Orr*, 586 F.2d at 1113, and Michigan Supreme Court cases cited therein. *See also Weeren, supra*, 379 Mich. at 511, 152 N.W.2d 676.

Unless the Michigan Court of Appeals relied on by the majority has been empowered to overrule the Michigan Supreme Court, the majority's reliance on the Court of Appeals is misplaced. It is well established that

> [w]here an intermediate appellate state court rests its considered judgment upon the rule of law which it announces, that is datum for ascertaining state law which is not to be disregarded by a federal court unless it is convinced by other persuasive data that the highest court of the state would decide otherwise.

**3.** In fact, the *Gaynes* Court noted that its definition of malice is inconsistent with the definition recognized by the Court of Appeals in *Postill v. Booth Newspapers, Inc.*, 118 Mich.App. 608, 619–20, 325 N.W.2d 511 (1982). *See Gaynes*, 128 Mich.App. at 51, n. 4, 339 N.W.2d 678. *Postill* retained the common law definition of ill-will and spite as the proper definition in cases not involving public officials or figures.

Furthermore, the *Gaynes* Court specifically restricted its definition of malice and holding to the facts presented and expressed no opinion concerning purely private defamation. 128 Mich.App. at 51–52, n. 4, 339 N.W.2d 678. It is only the majority's creation of a "reasonable relationship" test which brings this otherwise concededly private defamation within the Michigan qualified privilege, however defined.

*West v. American Telephone & Telegraph Co.*, 311 U.S. 223, 237, 61 S.Ct. 179, 183, 85 L.Ed. 139 (1940). Thus, even if the statements about Bichler were properly held to be within the Michigan qualified privilege, the common law rather than *New York Times* definition of malice must be applied.

The Michigan Supreme Court has placed a higher standard of behavior on the publisher of private facts. "Good faith" is subjective, and is not satisfied by the mere absence of knowledge of impropriety, or reckless disregard of the impropriety. Good faith requires an honest belief in the non-damaging nature of the publication, and not merely absence of knowledge of the likelihood of injury. An affirmative duty has been placed on the Michigan media to behave reasonably.[3]

In many respects, the standard that the statement be "honestly believed to be true, and published in good faith" is analogous to the standard of negligence for private defamation recently adopted by the Ohio Supreme Court in the case of *Embers Supper Club, Inc. v. Scripps-Howard Broadcasting Co.*, 9 Ohio St.3d 22, 9 OBR 115, 457 N.E.2d 1164 (1984). By defining the question for the jury as "whether the defendant acted reasonably in attempting to discover the truth or falsity or defamatory character of the publication," the Ohio Supreme Court agreed with what it determined to be a majority of other jurisdictions faced with establishing the appropriate standard in like cases.[4]

**4.** The other cases and states identified by the Ohio Supreme Court are:

*Peagler v. Phoenix Newspapers, Inc.* (1977), 114 Ariz. 309, 560 P.2d 1216; *Dodrill v. Arkansas Democrat Co.* (1979), 265 Ark. 628, 590 S.W.2d 840, certiorari denied (1980), 444 U.S. 1076, 100 S.Ct. 1024, 62 L.Ed.2d 759; *Phillips v. Evening Star Newspaper* (D.C.App.1980), 424 A.2d 78, certiorari denied (1981), 451 U.S. 989, 101 S.Ct. 2327, 68 L.Ed.2d 848; *Karp v. Miami Herald Publishing Co.* (Fla.App.1978), 359 So.2d 580, appeal dismissed (Fla.1978), 365 So.2d 712; *Cahill v. Hawaiian Paradise Park Corp.* (1975), 56 Hawaii 522, 543 P.2d 1356; *Troman v. Wood* (1976), 62 Ill.2d 184, 340 N.E.2d 292; *McCall v. Courier-Journal & Louisville Times* (Ky.1981), 623 S.W.2d 882; *Gobin v. Globe Publishing Co.* (1975), 216 Kan. 223, 531 P.2d 76; *Stone v. Essex County News-*

Although *Cantrell* presented no occasion to consider whether a state may constitutionally apply a more relaxed standard than the *New York Times* definition of actual malice in cases involving a false-light theory of invasion of privacy, 419 U.S. at 250, 95 S.Ct. at 469, I can see no reason why *Gertz* would not allow the states to define their own standard of liability when the damage from the invasion of privacy is the same as from a libelous falsehood. 418 U.S. at 347, 94 S.Ct. at 3010. Nor is there reason to believe the Michigan Supreme Court would depart from the majority of jurisdictions and its own precedent and choose to undercut the right of its private citizens to redress attacks upon reputation, in favor of the public's right to know *via* the news media, about an essentially private contractual dispute and its speculative impact on the public. Both the traditional "negligence" standard, and the "honestly believed to be true, and published in good faith" test serve the states' pervasive and strong interest in preventing and redressing attacks upon reputation, by affirmatively requiring the media to behave reasonably when its reports on matters about private individuals, such that the media's belief in the truth of its publication can be held "honestly" and in "good faith." Furthermore, it seems clear that the Michigan courts would apply a negligence standard for cases such as this, which fall outside the scope of the Michigan qualified privilege.

### III.

I most strongly disagree with this court's holding that summary judgment was appropriate in this case.

First, I conclude that even under the *New York Times* standard of actual malice, Appellant Bichler has sufficiently demonstrated the existence of a genuine issue of material fact as to the existence of such malice. Although the majority has contrasted Bichler's appeal with *Arber v. Stahlin*, 382 Mich. 300, 170 N.W.2d 45 (1969), I rely on the more recent Michigan Supreme Court case of *Steadman v. Lapensohn*, 408 Mich. 50, 288 N.W.2d 580 (1980).

The similarities between the instant case and *Steadman* are striking. In *Steadman*, the plaintiff was an unsuccessful candidate for the office of judge. The Traverse City newspaper printed a number of articles regarding Steadman's campaign, focusing on the financial problems of businesses with which Mr. Steadman had been associated, and a number of pending lawsuits against him. A libel action was brought against the newspaper, with the plaintiffs contending that the articles and editorials contained false and defamatory statements about plaintiffs, and that their reputations were damaged as a result. After the taking of depositions and the filing of affidavits, the trial judge granted the newspaper's motion for summary judgment, concluding that the articles were essentially true and that there was no evidence of actual malice.

In its unanimous *per curiam* opinion, the Michigan Supreme Court reversed the grant of summary judgment. Regarding the issue of malice, the Court stated:

It is clear that the actual malice necessary to defeat a conditional privilege can be established by inference. Indeed, given the very subjective nature of the test for actual malice, circumstantial evidence may be the only kind available on the issue. In this case, we do not know whether a fact finder would infer actual malice from the present record. How-

papers, Inc. (1975), 367 Mass. 349, 330 N.E.2d 161; *Jacron Sales Co. v. Sindorf* (1976), 276 Md. 580, 350 A.2d 688; *Madison v. Yunker* (1978), 180 Mont. 54, 589 P.2d 126; *McCusker v. Valley News* (1981), 121 N.H. 258, 428 A.2d 493; *Marchiondo v. Brown* (1982), 98 N.M. 394, 649 P.2d 462; *Martin v. Griffin Television, Inc.* (Okla.1976), 549 P.2d 85; *DeCarvalho v. DaSilva* (R.I.1980), 414 A.2d 806;

*Memphis Publishing Co. v. Nichols* (Tenn. 1978), 569 S.W.2d 412; *Foster v. Laredo Newspapers, Inc.* (Tex.1976), 541 S.W.2d 809, certiorari denied (1977), 429 U.S. 1123, 97 S.Ct. 1160, 51 L.Ed.2d 573; *Seegmiller v. KSL, Inc.* (Utah 1981), 626 P.2d 968; and *Taskett v. King Broadcasting Co.* (1976), 86 Wash.2d 439, 546 P.2d 81.

ever, it is clear that the record was sufficient to create a genuine issue of fact as to that question.

408 Mich. at 55, 288 N.W.2d 580. As examples of evidence supporting the inference of malice, the Michigan Supreme Court referred to the manner in which the articles were prepared,[5] whether the subject of the articles was given an adequate opportunity to reply, and whether other evidence supported the possibility of actual knowledge of the articles' falsity. *Id.* at 55, n. 5, 288 N.W.2d 580.

The majority opinion, *ante*, states that "[c]ontrary to Bichler's claim, neither he nor any other deponent or affiant stated that he advised Rummel that Moore was untrustworthy." I cannot agree. Bearing in mind that in summary judgment, the evidence must be construed in its most favorable light in favor of Mr. Bichler and against the moving party, I first refer the majority to the deposition testimony of David Kowalczyk, as contained in the Joint Appendix, pages 141–44:

Q And who did you talk to at the TV station?

A I talked to Jim myself.

Q Jim, who is Jim?

A Rummel.

Q What did you say to him and what did he say to you?

\* \* \* \* \* \*

A Well, I know that in the excitement, so forth, he had the tapes around his neck, getting ready to put it on TV, and I asked him if he would—you know, he got all his information from Jerry Moore, and Jerry Moore is a noted liar, anyway, and—

Q You asked him what?

A I just asked him to keep it off the air.

Q What were his exact words to you?

A He says he could not keep it off the air because it was news, and that was his job. I said to him, I says, "That could be the straw that broke the camel's back," and—

Q You told him that?

A I did.

Q What did you mean by that phrase?

A And I pleaded—

Q Did you explain it to him? If you explained it to him, what did you explain to him?

A I said, "News like that will just make the thing in bad shape, and we don't need publicity like that at this particular time." And here it is 10:00 at night, and I asked him, "Give me a day or two to check some of these things out, to locate Dick Bichler, and the truth of the whole story."

Q And what did he say?

A He refused to listen to me.

\* \* \* \* \* \*

Q Did you tell Jim Rummel, the night the show was aired, that Jerry Moore is a liar?

A No.

Q Did you tell Jim Rummel that Jerry Moore was not a person to be believed, words less strong than "liar"?

A Probably.

Q Where would you have gotten that information, if you knew nothing about his reputation or background?

A From talking to Jerry Moore himself.

Q Do you distinctly recollect telling Jim that Jerry Moore is not a truthful person?

A I think it would be safe to say that I indicated to Jim Rummel that the story gotten from Jerry Moore, possibly it would not be true, yes. I imagine I could, I could safely say I indicated to

---

**5.** The majority relies, *ante,* on *St. Amant* for the proposition that recklessness is not measured by whether a reasonably prudent man would have published or investigated, but whether the publisher in fact entertained serious doubts as to the truth. However, *St. Amant* is inconsistent with *Steadman, supra,* which clearly allows the manner in which the article was prepared to support an inference of malice. Since the majority agrees that in cases involving concededly private individuals such as Bichler, the States are free to define their own standard of liability, *see Gertz, supra,* then *Steadman* and not *St. Amant* should control our analysis, at least in cases of private defamation, or common law rather than actual malice.

Jim Rummel that we should wait with airing that news because he only got his information from Jerry Moore, from what I understood.

Q You are assuming that that is what you said?

A That is correct.

Q You do not distinctly recall saying that? And I recognize it was four years ago.

A The chances are good that I did, if I am standing there telling him not to put it on the air. I had to tell him something.

Q I am curious to know if you remember what you told him.

A No.

Q No?

A The answer is, yes, I don't precisely know what I did exactly say.

Kowalczyk's deposition is in contrast to the deposition testimony of James Rummel, found at pages 128–29 of the Joint Appendix:

Q And did they ask you—isn't it a fact that they asked you not to put that program on the air?

A Mr. Kowalczyk did.

Q And Mr. Kelly did, too?

A He may have; I was listening to Mr. Kowalczyk.

Q Isn't it a fact that they told you the statements made by Moore were untrue?

A I don't remember that.

Q Is it a fact that they told you to air that program without verification would endanger the credit of the dinner theatre?

MR. CRAGWELL: Excuse me, the question was, to air the program without verification would endanger—

Q —of the truthfulness of Mr. Moore's statement, would endanger the credit of the theater?

A They did not couch it in those terms, as I best remember. They said—

Q What terms did they couch it in?

A They asked me, as a personal favor, to hold it.

The majority further ignores Richard Bichler's deposition testimony before the district court and, in part, found at page 104 of the Joint Appendix:

A ... I know this, that Mr. Kowalcyk [sic] and Mr. Foster went directly to Channel 13 before the broadcast. I know that they told the news director that the statements that Gerald Moore made were completely false and they should not run it. I know that the next morning I called the news director on two different occasions between 10:00 and 12:00, demanding a retraction, and I also know that the man did not show me the courtesy to come to the phone.

\* \* \* \* \* \*

Q When you placed your phone calls the following morning—

A Yes?

Q —who did you ask to talk to?

A I asked for the news director.

\* \* \* \* \* \*

Q Did you leave your telephone number?

A Yes?

Q What telephone number did you leave?

A Thunder Chicken's telephone number, because I was there, I was waiting for a call. I called him from my office at the Thunder Chicken, and that, by the way, was the next morning.

Q Did you, the day before, that is, the day that you observed this telecast in the evening at 11:00, did your receive any calls, to your knowledge, from WZZM?

A None.

\* \* \* \* \* \*

Q Did you talk to anyone other than the person who answered the phone?

A I did not. It was made emphatically clear to me, by what I feel is attitudes, that nobody wanted to talk to me that day.

Q The attitude was expressed by the person who answered the phone at WZZM?

A Yes.

\* \* \* \* \* \*

A ... I identified myself, and I said that I wanted to talk to the news director. I told whoever I talked to that the program that I watched the night before was entirely false, and I wanted a retraction. I must have waited five or six minutes, she got back on the phone and told me that whomever I wanted to talk to was busy, and that I should call back. I called back—

Q Just a minute, before we leave that phone conversation, did you leave your number?

A Yes, I left my number, and, by the way—

Q You can remember that?

A Oh, yes. "ZZM was very familiar with us.

The majority describes this portion of the record as "vague," but I see nothing vague about it; Bichler's testimony is crystalline. There is no evidence that the station ever printed a retraction, or even got back with Bichler about the truthfulness of its report.

Bichler's conversation with the station after one of the broadcasts, indicating the story was false and that he wanted a retraction, along with the conflicting statements of Kowalczyk and Rummel, clearly document the existence of a material question of fact as to whether Rummel and WZZM–TV were told that the report was false, so as to satisfy the *New York Times* standard of actual malice.

I further point out to the court its clearly erroneous conclusion, *ante*, at note 1, that based on "the absence of affidavits or other evidence," the broadcast did not contain any reference to the theatre as a "cooked chicken." The deposition testimony of one Robert Cecil, found in the Joint Appendix at page 110, contains the following discussion regarding that question of fact:

Q Could that have taken place on January 21, 1976?

A Sure.

Q Did you observe or see any T.V. program relative to that dispute that took place?

A Well, I don't remember the exact night, but, again, there was a newscast that came on after Jerry Moore and Dick Bichler had their confrontation, and Mr. Moore was out of a job, he went to the news media and started telling some stories that were in no way fact.

Q Just tell me what you saw. Did you see that program?

A Yes, I did.

Q What did you see on the program?

A Well, the caption before the news came on was, it was either a plucked chicken or a cooked chicken.

Q Was there any display or presentation of a picture?

A Yes, I think there was an animated picture of a plucked bird that came on the screen.

Q Do you remember the exact news broadcast? Do you remember what was said and by whom it was said?

A I am not sure. I think it was Jim Rummel that was doing the broadcast, and, like I say, you know, most of their people that worked at the Thunderbird saw it that night.

A "cooked chicken" also clearly supports an inference of unobjective, malicious reporting.

Next addressing the *Steadman* factor regarding the manner in which the report was prepared, it is undisputed that Bichler was never actually contacted by Rummel or the station prior to publication of the report. Furthermore, the fact that the report's substance made substantial danger to reputation apparent, *see Curtis, supra,* 388 U.S. at 155, 87 S.Ct. at 1991, is evidenced by Rummel's "investigation" after the first but before the second broadcast to make sure Bichler was really suffering from the reported financial difficulties. Rummel and WZZM have offered no justification for their insistence on publishing

allegations involving Bichler's private financial matters prior to contacting him for his side of the story.[6]

Additionally, Kowalczyk told Rummel that he, a partner in the corporate business, had no knowledge of the closing until shortly before arriving at the station:

A Well, he just confirmed that the things I just said to you before, about the place being closed and so forth, and I told him that it was—I just found out about it about an hour ago, and I urged or asked him not to put it on the news, give us some time for the troops to get together, part of the— you know, just ask him if he would delay putting it on TV.

Q What did he say to you?

A He said he was making news, that was his job.

Q And did you ask him about whether or not he had checked this out in any way, the veracity of the statements?

A No, I didn't ask him if he checked it out. Myself, I didn't know what was going on.

Joint Appendix at page 140. The report contained no reference to Kowalczyk's surprise about the theatre's "closing."

Kowalczyk's testimony that he probably told Rummel that Moore was untrustworthy, Bichler's attempts to get a retraction of the false story, the failure or refusal of Rummel or WZZM to contact Bichler before airing the story, the substantial danger to reputation and privacy apparent on the story's face, the possibility of excessive publication, Kowalczyk's lack of knowledge that the theatre was closing, and the possible reference to a "cooked chicken" all create inferences supporting the existence of a genuine issue of material fact as to malice, even as defined in *New York Times Co. v. Sullivan*. Furthermore, as Justice

Adams noted in *Weeren, supra*, the immediacy of the public's interest in the story affects the degree of reasonable investigation required of the news media, with improper conduct eliminating the qualified privilege.

The above discussion, of course, applies equally whether abuse of the privilege is defined by the *New York Times* standard of actual malice, the Michigan standard of common law malice and absence of good faith, or negligence. And the same triable facts would also create a genuine issue of material fact concerning the attitudes of Rummel and WZZM toward Richard Bichler's privacy, regardless of whether abuse is defined by the *New York Times* standard, the common law malice standard, or negligence, as properly modified to address the invasion of privacy.

Other material questions of fact exist in this case. The jury should determine whether the theatre and Bichler were actually having financial problems, what contractual provisions existed between Bichler and the cast, and whether the advance ticket holders really were left "in the lurch." Indeed, whether the report was ambiguous enough to imply that the theatre itself, and not just the current production, was closing as a result of Bichler's alleged misdoings, is a proper jury question. Furthermore, the district court's findings that "the reference to Bichler's financial condition was not highly offensive nor made 'for its own sake'" is just as clearly a question of material fact for the jury, as is the defamatory or "false light" nature of the broadcast. See *Steadman, supra*, 408 Mich. at 53–54, 288 N.W.2d 580; *Timmis, supra*, 352 Mich. at 366, 89 N.W.2d 748; *Weeren, supra*, 379 Mich. at 493, 503–04, 511, 513–14, 152 N.W.2d 676.[7]

---

**6.** Under Michigan law, excessive publication supports an inference of malice. *Timmis, supra*, 352 Mich. at 371–72, 89 N.W.2d 748. When Bichler told the station that the report was false, and demanded a retraction, the station was not then free to air the report without substantial additional investigation, but may have done so anyway. Thus, Bichler's deposition also raises

the issue of malice by excessive publication for determination by the jury at trial.

**7.** It is ironic that the majority would refer to *Weeren* as "reversed on other grounds," for the inappropriateness of summary judgment in cases involving defamatory publications and in-

The majority cannot seriously dispute that the one-sided efforts of Rummel to verify his attempt to "make the news" raises an inference of malice regarding both the truth of the reports and the reports' invasion of Bichler's privacy. Numerous issues of material fact are present in this case, and properly should be submitted to the jury.

## IV.

Finally, I am compelled to address an important issue implicated by the result of the court's decision which arises under our own United States Constitution. The conclusion to the majority's opinion, *ante*, states:

> ... Michigan has long recognized the desirability of public comment on issues of legitimate public interest. This is the reason for its common law communication privilege. By adopting the constitutional standard for measuring malice when a private individual claims injury from publication or broadcast about a privileged matter of public interest Michigan has given further recognition to the necessity for a free play of ideas in an open society.

In holding that the Michigan privilege extends to the injury alleged by Mr. Bichler as a result of the public invasion by the news media into his private contractual affairs, the court ignores the fact that the individual's right of privacy is embraced not only by Michigan but also by our own Federal constitutional system of government. As Justice Douglas stated in *Griswold v. Connecticut*, 381 U.S. 479, 484, 85 S.Ct. 1678, 1681, 14 L.Ed.2d 510 (1965):

> ... specific guarantees in the Bill of Rights have penumbras, formed by emanations from those guarantees that help give them life and substance... Various guarantees [in the First, Third, Fourth, Fifth and Ninth Amendments] create zones of privacy.

Furthermore, as noted in *Gertz*, quoting Justice Stewart, the individual's right to protection of his own good name

vasions of privacy is the one thing on which the

"reflects no more than our basic concept of the essential dignity and worth of every human being—a concept at the root of any decent system of ordered liberty. The protection of private personality, like the protection of life itself, is left primarily to the individual States under the Ninth and Tenth Amendments. But this does not mean that the right is entitled to any less recognition by this Court as a basic of our constitutional system." *Rosenblatt v. Baer*, 383 U.S. 75, 92 [86 S.Ct. 669, 679, 15 L.Ed.2d 597] (1966) (concurring opinion).

418 U.S. at 341, 94 S.Ct. at 3008. *See also* Warren and Brandeis, *The Right to Privacy*, 4 Harv.L.Rev. 193 (1890). And our coordinate branches of government, by the Freedom of Information Act and the Privacy Act of 1974, have displayed sensitivity to this right of privacy. *But cf.* Galloway, *How Your Privacy Is Being Stripped Away*, 96:17 U.S. News & World Rep. 46 (April 30, 1984).

Under our Federal Constitution, the state should not, through its courts, be free to strike the balance and thereby protect the news media's unreasonable invasions into the private financial dealings of its citizens, by erection of the insurmountable barrier of actual malice. *Gertz* makes it clear that even "the necessity for a free play of ideas in an open society" must at some point give way to the individual's right of protection from and redress of injury to his private reputation. In cases involving public defamation, potential loss of the qualified privilege through abuse based on negligence or lack of good faith would require the press to behave reasonably under the circumstances of each case. Self-censorship should not be confused with responsible reporting.

This court's implicit (and necessary) assumption regarding the constitutionality of its own opinion further ignores the context in which Justice Powell stated in *Gertz* that:

plurality was unanimous.

... so long as they do not impose liability without fault, the States may define for themselves the appropriate standard of liability for a publisher or broadcaster of defamatory falsehood injurious to a private individual.

418 U.S. at 347, 94 S.Ct. at 3010. For as the *Gertz* Court continues in its discussion of this limitation on liability:

This approach provides a more equitable boundary between the competing concerns involved here. It recognizes the strength of the legitimate state interest in compensating private individuals for wrongful injury to reputation, yet shields the press and broadcast media from the rigors of strict liability for defamation. At least this conclusion obtains where, as here, the substance of the defamatory statement 'makes substantial danger to reputation apparent.' [quoting *Curtis Publishing Co. v. Butts, supra,* 388 U.S. at 155, 87 S.Ct. at 1991].

*Id.* at 347–48, 94 S.Ct. at 3010–11. In assessing the impact of the *Gertz* limitation on the states' right to impose boundaries on the press, it is also significant to note that both Chief Justice Burger implicitly and Justice White explicitly dissented on the grounds that the states should be free even to impose strict liability upon the media, and that the jury's verdict in the original trial was proper and should have been reinstated even if creating liability without fault.

*Gertz* may properly be relied on for the shield from strict liability which it provides the media. The majority opinion, however, has converted the shield to a sword, to be wielded by the press, absent malice, as it disregards the private aspects of an individual's life which bear some unfortunate tangential relationship to the matter of legitimate public interest. Such armament is one-sided and ill-conceived. Society has not benefitted by the allegedly false revelation that Richard Bichler, a concededly private individual, is financially and contractually unreliable. By recognizing a privilege in this case, the majority has gone to great lengths to protect information of such little value to "uninhibited, robust, and wide-open" debate on issues of legitimate public concern. *New York Times Co. v. Sullivan,* 376 U.S., at 270, 84 S.Ct., at 721.

I would reverse the judgment of the district and remand the case for trial by jury.